UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| KIMBERLY L. HARDER, | ) | |
| (Social Security No. XXX-XX-6772), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:09-cv-43-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 6, 13) and an Order of Reference entered by Chief Judge Richard L. Young on August 31, 2009 (Docket No. 17).

### I.  Statement of the Case

Plaintiff, Kimberly Harder, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f).  This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff initially filed for DIB on June 10, 2003, alleging disability since August 2, 2000. (R. 84-86). That decision was denied by the agency on December 16, 2003, and there is no record of further action by Plaintiff. (R. 46-49). Therefore, the decision is res judicata, and Plaintiff is not entitled to benefits prior to December 16, 2003.

Plaintiff then applied for DIB and SSI on July 27, 2004, alleging disability since August 2, 2000. (R. 69-71, 962-64). The agency denied Plaintiff's application both initially and on reconsideration. (R. 37-38, 41-43). Plaintiff appeared and testified at a hearing before Administrative Law Judge George Jacobs ("ALJ") on October 10, 2007. (R. 984-1032). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 984). On January 24, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 12-25). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 2-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on March 30, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 35 years old at the time of the ALJ's decision and had a high school education. (R. 24). Her past relevant work experience

included work as a sander, press operator, inspector, and produce manager. (R. 26-27).

**B. Medical Evidence**[1]

### 1. Plaintiff's Mental Impairments

On May 6, 2002, Plaintiff presented to a social worker at the Good Samaritan Hospital at the recommendation of her attorney in connection with a worker's compensation case. (R. 346-48). Plaintiff reported that she had been crying, irritable, depressed, temperamental, and fatigued. (R. 346). Her mood was sad and her affect was congruent with her mood, but she denied any suicidal ideation. She displayed average to above average intellectual functioning. (R. 347). The social worker diagnosed Plaintiff with Major Depressive Disorder, recurrent, and recommended that she be seen in individual therapy; she was assessed a GAF score of 59.[2] (R. 348). On May 22, 2002, Patrick Helfenbein, M.D., prescribed Wellbutrin to treat her depressive symptoms. (R. 356). Following her diagnosis of depression, Plaintiff began individual therapy sessions. (R. 349-55). However, the record reflects that Plaintiff did not follow through with her outpatient therapy, cancelling multiple appointments. (R. 349-52).

---

[1]In Plaintiff's Brief in Support of Complaint she does not find fault with any aspect of the ALJ's determination concerning her *physical* impairments. Therefore, the Court has not listed any of the medical evidence concerning her physical impairments, as it does not have any bearing on this determination.

[2]A GAF score of 51-60 indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning.

On December 15, 2002, Plaintiff was admitted for two days at Memorial Hospital due to a possible overdose after taking 30 pills of Wellbutrin. (R. 398-404). A toxicology screen was positive for amphetamines, marijuana, and opium at that time. (R. 404).

In January 2003, Houshmand Rezvani, M.D., a psychiatrist, conducted a psychiatric evaluation of Plaintiff. (R. 614-15). Plaintiff reported that she tried to overdose because she was depressed after a few surgeries, her boyfriend was incarcerated, and she lost her job. (R. 614). She reported experiencing fatigue, feelings of hopelessness, worthlessness, and suicidal thoughts. (R. 614). She also reported having a few episodes of panic attacks, but Dr. Rezvani noted that they were more likely simply episodes of nervousness. (R. 614). Dr. Rezvani noted that Plaintiff had not been on any medications over the past six months. (R. 614). Plaintiff reported that she drank to the point of being drunk once every two months, used marijuana two to three times per month, and used amphetamines a couple times a week as well. (R. 615). She stated that she had abused drugs and alcohol to a much worse degree in the past. (R. 615). Plaintiff's speech was normal, her insight and judgment were marginal, and her intelligence was average. (R. 615). Dr. Rezvani noted that her mood and affect were depressed, but that there was no evidence of auditory/visual hallucination, delusional ideation, or suicidal/homicidal ideation, intention, or plan. (R. 615). Dr. Rezvani diagnosed Plaintiff with Polysubstance Dependence and Major Depressive Disorder with Dysphoric Mood, primary or secondary to abusing

substances, and assigned a GAF score of 30.[3]  (R. 615). He explained that he believed that her substance abuse could be causing her depression or exacerbating her symptoms.  (R. 615).  He encouraged her to stop abusing substances, but stated that he was not sure that Plaintiff was enthusiastic about this recommendation.  (R. 615).  He prescribed Wellbutrin and Paxil.  (R. 615).

On March 20, 2003, Plaintiff presented to Memorial Hospital after overdosing on Paxil and Trileptal.  (R. 239-42).  The attending physician noted that a toxicology screen was also positive for marijuana and amphetamines.  (R. 241, 242).  Plaintiff reported that the precipitating factors which lead to this overdose included the stresses of being unemployed, not having insurance, applying for Worker's Compensation benefits, and arguing with her uncle.  (R. 241).  Plaintiff was diagnosed with polysubstance overdose and severe depression with suicidal ideation.  (R. 239).  Following observation and medical stabilization in the Intensive Care Unit, Plaintiff was transferred to the Behavioral Health Unit.  (R. 240, 252-53).  Following the transfer, it was noted that Plaintiff had been a long-term client of the Memorial Counseling Center for her mood difficulties, which included periods of being irritable and experiencing dysphoria.  (R. 252).  Plaintiff had been placed on a trial of medication, but unbeknownst to her clinician, she continued to abuse recreational drugs.  (R.

---

[3] A GAF score of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas.

252).  Plaintiff's affect was observed to be depressed, but there was no observed evidence of gross psychosis or markedly impaired cognitive functioning.  (R. 252).  During the course of her hospitalization, the Plaintiff showed gradual and progressive clinical stabilization with no recurrence of suicidal ideation.  (R. 253).  It was also noted that Plaintiff's mood spontaneously improved in the absence of recreational drugs.  (R. 253).  Plaintiff was diagnosed with Polysubstance Dependence, Affective Disorder Secondary to Abusing Substances, and Borderline Personality Disorder.  (R. 252).  At the time of discharge, Plaintiff's prognosis was guarded due to her long-term history of drug use and her complicating character disorder.  (R. 253).  Plaintiff was assigned a GAF score of 60.[4]  (R. 252).

On July 7, 2003, Dr. Rezvani composed a letter stating that Plaintiff first presented to him in January 2003 with major depressive symptoms, probably induced by alcohol or other substances.  (R. 603).  However, Dr. Rezvani noted that, since Plaintiff had stopped using alcohol and had minimized the use of other substances, he had observed a remarkable change in her condition.  (R. 603).  Dr. Rezvani reported that Plaintiff had been looking for a job, but that she had not yet received a job offer.  (R. 603).  He stated that Plaintiff's prognosis depended upon whether or not she engaged in further drug and alcohol abuse.  (R. 603).

---

[4]This score indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning.

On September 20, 2003, Plaintiff met with Dr. Vance Norum, M.D., for a psychiatric evaluation.  (R. 225).  Plaintiff denied having any medical problems and stated that she did not take any medications at that time.  She did complain of hypersomnia.  (R. 225).  Dr. Norum reported that a mental status examination was within normal limits and that Plaintiff denied having any suicidal ideation.  Dr. Norum diagnosed Plaintiff with Bipolar Disorder NOS, and Borderline Personality Disorder.  He prescribed Effexor and Lamictal to treat her Bipolar Disorder and depressive symptoms.  (R. 225).

In September 2003, Plaintiff began attending therapy sessions with Dr. Melissa Umali, a clinical psychologist.  (R. 216).  Dr. Umali noted that, although Plaintiff had a history of suicide attempts, she denied any current thoughts of suicide.  (R. 216).  Plaintiff reported that she had a history of panic attacks when in social situations.  (R. 216).  Dr. Umali noted that Plaintiff had been previously diagnosed with Bipolar Disorder and Borderline Personality Disorder.  (R. 216).  In late September 2003, Plaintiff reported that she had been sleeping better and was less irritable since starting her medications a week prior; she reported having a panic attack a few days prior when she learned that her boyfriend was in jail.  (R. 215).

In October 2003, Plaintiff reported that she was sleeping better and that she had been more assertive with her family.  (R. 214).  In December 2004, Plaintiff reported that she continued to work part-time at the American Legion performing cleaning duties and reported a stable mood.  (R. 208).  In January

2005, Plaintiff reported that her mood had been stable, but that she continued to feel anxious around others.  (R. 206)  In February 2005, Plaintiff stated that she had been sleeping excessively and felt irritable and depressed.  (R. 205).  However, Plaintiff reported that she had been able to force herself to get out of bed and socialize more frequently.  (R. 205).

On October 16, 2003, Dr. Umali composed a letter to a caseworker for the Martin County Department of Family and Children.  (R. 223).  She stated that Plaintiff had been diagnosed with Bipolar II Disorder and noted that Plaintiff had begun taking medication to stabilize her moods.  Dr. Umali stated that she felt that Plaintiff would not be able to function effectively in society without proper medication and counseling.  She opined that Plaintiff was not stable enough to handle the demands of full-time employment at that time.  (R. 223).

On November 6, 2003, Albert Fink, Ph.D., conducted a consultative mental status evaluation.  (R. 330-32).  Plaintiff reported a two and a half week hospitalization at Charter Hospital in 1995 following the death of her fiancé in an automobile accident.  (R. 330).  She acknowledged extensive use of alcohol as a teenager, which led to three convictions for underage drinking; she also used methamphetamines in the past.  (R. 330).  Plaintiff stated that she stopped using all drugs and alcohol nine months earlier.  (R. 330).  Dr. Fink noted that Plaintiff had no difficulty understanding or following instructions.  (R. 330).  Her cognitive structure was basically intact.  (R. 330).  Dr. Fink reported that her mood was dysphoric, her affect was somewhat restrained, and her speech was

logical and sequential.  (R. 331).  He noted that there was no evidence of unusual thought process, bizarre ideation, or suicidal thinking.  (R. 331).  Plaintiff stated that she was able to perform all basic household tasks, cook, do laundry, drive, shop, and manage personal finances; she also reported that her hobbies included making candles.  (R. 331).  Based on his examination, Dr. Fink concluded that Plaintiff was alert, oriented, and cognitively intact with memory, comprehension, and social skills within normal limits.  (R. 331).  He stated that, although Plaintiff had a history of Major Depressive Disorder and presented with some depressive symptoms, there was no evidence of psychotic symptoms.  (R. 331).  He opined that Plaintiff's depressive symptoms did not appear to be disabling.  (R. 331).  He stated that Plaintiff's main difficulties with daily functioning appeared to be related to her shoulder pain rather than any mental impairment.  (R. 331).  Dr. Fink opined that Plaintiff was capable of functioning in typical work environments and social settings.  (R. 331).  He diagnosed Plaintiff with Depressive Disorder NOS; Alcohol Dependence, In Partial Remission; and Methamphetamine Dependence, In Partial Remission, and he assigned a current GAF score of 68.  (R. 332).

On February 3, 2004, Dr. Umali composed another letter to the Martin County Department of Family and Children.  (R. 224).  Dr. Umali noted that Plaintiff had a history of mood swings, sleep disturbances, irritability, anxiety, suicidal ideation, and panic attacks.  She stated that, since starting therapy, Plaintiff had been through depressive and hypomanic phases of her Bipolar II

Disorder; however, she tended to be more depressed.  (R. 224).  Dr. Umali noted that Plaintiff had a long history of dysfunctional relationships.  Dr. Umali reported that Plaintiff's medications had been helpful, but that they had not been effective enough to allow her to function over a sustained period of time.  Dr. Umali again opined that Plaintiff was not stable enough to handle the demands of full-time employment.  (R. 224).

On November 17,  2004, Plaintiff complained of excessive sleeping and depressed mood to Dr. Norum.  (R. 862).  She denied having any suicidal ideation.  Plaintiff was stable psychiatrically.  Dr. Norum diagnosed her with Borderline Personality Disorder and Mood Disorder NOS with bipolar spectrum features, and prescribed Wellbutrin.  (R. 862).

On November 23, 2004, Dr. Umali completed a Report of Psychiatric Status after Plaintiff had recently returned to therapy.  (R. 291-96).  Dr. Umali noted that Plaintiff had been diagnosed with Bipolar Disorder, mixed states, and Borderline Personality Disorder.  (R. 291).  She rated Plaintiff's current GAF score as 60 and also reported that Plaintiff had been working 11 hours per week at her local American Legion.  (R. 291).  Dr. Umali reported that Plaintiff's mood and affect were appropriate, her speech was relevant, and her thoughts were logical.  (R. 292).  Dr. Umali opined that Plaintiff was able to attend to simple work; however, she stated that Plaintiff had multiple episodes of debilitating depression several times a year lasting for two to three weeks.  (R. 295).  She noted that Plaintiff had quit a bartending job due to panic attacks and

social anxiety and was sometimes unable to attend her part-time job due to depression.  (R. 295).

On February 17, 2005, Dr. Umali composed yet another letter to the Disability Determination Bureau.  (R. 203).  Dr. Umali noted that she had been treating Plaintiff in therapy for the past two years and that she had been diagnosed with Bipolar Disorder II, most recent episode depressed.  She stated that Plaintiff had a history of emotional and behavioral problems.  (R. 203).  She reported that, over the past several months, Plaintiff had exhibited the following depressive symptoms:  an inability to experience pleasure, fatigue, feelings of worthlessness, excessive feelings of guilt, daily feelings of sadness, and excessive need to sleep.  (R. 203).  Dr. Umali stated that, because of the severity of her depression, Plaintiff struggled with basic daily living skills such as hygiene, cooking, and cleaning.  She stated that Plaintiff was socially withdrawn and had a history of experiencing panic attacks.  Dr. Umali further stated that Plaintiff's short-term memory was impaired and that she had significant difficulties with organizational skills.  (R. 203).

On February 22, 2005, Plaintiff told Dr. Norum that she was pregnant and stated that she wanted to continue taking Wellbutrin if it would not hurt her baby.  (R. 862).  On April 27, 2005, Plaintiff reported a decrease in her depression and anxiety.  She stated that she was finding support among family and friends.  (R. 896).

In January 2006, Rajaie Obaid, M.D., a neurologist, observed that Plaintiff's mental status was normal, her speech was good, her memory was good, and her attention span and concentration were normal.  (R. 938).

On March 22, 2006, Dr. Umali noted that Plaintiff had been sleeping well, but that she was still emotional.  (R. 884).  She stated that Plaintiff was future oriented with no suicidal ideation.  (R. 884).  On March 31, 2006, Plaintiff complained of having five panic attacks in the past month.  (R. 861).  She had been compliant with her medications, and her condition was stable.  Dr. Norum increased her dosage of Lamictal and added Ativan to help treat her anxiety and panic attacks.  (R. 861).

On January 24, 2007, Plaintiff reported some improvement in her mood; however, she continued to be very sensitive and anxious.  She stated that she had been sleeping well at times.  (R. 873).

On April 26, 2007, Jane Will, Psy.D. conducted a psychological evaluation and intelligence testing.  (R. 857-59).  The intelligence testing indicated that Plaintiff was generally in the low average to average range of intellectual functioning.  (R. 857-58).

On June 13 2007, Dr. Umali completed a Mental Source Statement of Ability to Do Work-Related Activities (Mental).  (R. 855-56).  Dr. Umali opined that Plaintiff had extreme limitations in her ability to understand, remember, and carry out detailed instructions.  (R. 855).  She also opined that Plaintiff had marked limitations in her ability to understand, remember, and carry out short,

simple instructions; to make judgments on simple work-related decisions; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting.  (R. 855-56).  She further opined that Plaintiff had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers.  (R. 856).  Dr. Umali stated that her opinion was supported by her clinical findings that Plaintiff was very distractible, easily agitated, confused, and struggled with work functioning.  (R. 855).  She stated that Plaintiff had moderate social anxiety that tended to overwhelm her to the point of being incapacitated in a work environment.  (R. 855).  She also reported that Plaintiff slept excessively, which caused her to be unable to go into work.  (R. 856).

On August 15, 2007, Plaintiff reported a significant improvement in her mood, and she told Dr. Umali that she had been sleeping better.  (R. 866).  On September 12, 2007, Plaintiff reported an increase in anxiety and frustration.  (R. 865).  However, she also discussed her recent success of being assertive at work.  (R. 865).

**2.  State Agency Review**

In December 2003, J. Pressner, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique.  (R. 317-29).  He stated that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace with no episodes of decompensation.  (R.

327).  Dr. Pressner opined that Plaintiff did not have a severely limiting mental impairment at that time.  (R. 329).

In December 2004, Fred Kladder, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  (R. 266-82).  In rating the "B" criteria under Listing 12.04, Dr. Kladder opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace with no episodes of decompensation.  (R. 280).  Dr. Kladder indicated that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 266-67).  Dr. Kladder noted that the basis for these findings was that Plaintiff had been diagnosed with Bipolar Disorder and Borderline Personality Disorder and had been assigned a GAF score of 60. (R. 268).  He also noted that she was currently participating in therapy.  (R. 268).  Dr. Kladder opined that Plaintiff was capable of performing simple, repetitive tasks on a sustained basis.  (R. 268).  On February 16, 2005, these findings were affirmed by B. R. Horton, Psy.D.  (R. 270).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since July 26, 2001, and that Plaintiff was insured for DIB through September 30, 2009.  (R. 14).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had six impairments that are classified as severe:  degenerative disc disease of the lumbar spine; status-post left shoulder surgery x 2; left elbow cubital tunnel syndrome; depression; borderline personality disorder; and a history of polysubstance abuse.  (R. 14).  The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14).  The ALJ determined that Plaintiff's testimony was not fully credible.  (R. 17).  The ALJ then found that Plaintiff retained the following RFC:  lift and carry ten pounds occasionally; sit for six and stand for two hours in an eight-hour workday; occasionally climb stairs/ramps, balance, stoop, kneel, crouch, or crawl; never climb ropes, ladders, or scaffolds; occasionally reach with the left upper

-16-

extremity; no contact with hazards such as machinery or unprotected heights; only simple repetitive tasks; and no more than occasional contact with co-workers/supervisors and no contact with the public.  (R. 16).  The ALJ determined that, based on this RFC, Plaintiff could not perform her past work, but could still perform a significant number of jobs in the regional economy, including jobs as assembler, inspector, and hand packager.  (R. 24-25).  The ALJ, therefore, concluded that Plaintiff was not under a disability.  (R. 25).

## VI.  Issue

Plaintiff has raised one issue.  The issue is as follows:

**Issue:      Whether the ALJ failed to give proper weight to the various medical opinions.**

Plaintiff argues that the ALJ failed to give controlling weight to the opinions of her treating psychologist, Dr. Melissa Umali, and gave too much weight to nonexamining state agency physicians.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or

-18-

ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f) *Opinions of nonexamining sources.* We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1) In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

In this case, Plaintiff argues that the ALJ committed error by not giving controlling weight to the opinions of Dr. Umali reported in a form completed June 13, 2007. (R. 855-56). Dr. Umali opined that Plaintiff had extreme limitations in her ability to understand, remember, and carry out detailed instructions, and marked limitations in her ability to understand, remember, and carry out short, simple instructions; to make judgments on simple work-related decisions; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. (R. 855-56). She further opined that Plaintiff had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers. (R. 856).

She also reported that Plaintiff slept excessively, which caused her to be unable to go into work.  (R. 856).

These opinions were not entitled to controlling weight.  First, they were not supported by other medical evidence in the record.  For instance, Dr. Fink opined that Plaintiff's depressive symptoms did not appear to be disabling.  (R. 331).  He opined that Plaintiff was capable of functioning in typical work environments and social settings, and he assigned a current GAF score of 68, which indicated mild symptoms.  (R. 332).  Additionally, Dr. Norum conducted a mental status examination that was within normal limits.  (R. 225).  Finally, two state agency physicians reviewed Plaintiff's case:  Dr. Pressner opined that Plaintiff had only mild symptoms (R. 317-29), while Dr. Kladder opined that Plaintiff had some mild and some moderate symptoms (R. 266-82).

Second, Dr. Umali's records were inconsistent with other evidence in the record.  Dr. Umali noted in November 2004 that Plaintiff had quit a bartending job due to panic attacks and social anxiety (R. 295), but this was refuted by Plaintiff's mother who had reported that Plaintiff quit the bartending job because she was unable to carry heavy objects (R. 22).  Dr. Umali also found extreme and marked limitations that were inconsistent with reports from Plaintiff's mother, who indicated that she saw Plaintiff every day and reported that Plaintiff socialized by talking on the phone, going shopping regularly with at least two friends, visiting with these friends, and even helping another friend clean her house.  (R. 114).  Plaintiff's mother also reported that Plaintiff could get along

well with others, take criticism, could finish tasks, and had a good memory, which was totally inconsistent with Dr. Umali's findings that Plaintiff was markedly limited in her ability to remember, understand, and carry out even simple tasks.  (R. 114).

Finally, as the ALJ also noted, in a report by Dr. Umali from February 2004, she had neglected to even mention Plaintiff's problems with substance abuse.  This is noteworthy because Dr. Rezvani had noted that Plaintiff's condition without substance abuse had improved remarkably (R. 603), and Plaintiff's mother had also indicated that Plaintiff's condition was improved without the use of drugs and alcohol (R. 114).  Based on all of these inconsistencies, as well as the fact that there were opinions from at least four other doctors in the record that provided much more mild limitations, it was well within the ALJ's discretion to determine that Dr. Umali's opinions were not entitled to controlling weight.  The ALJ's decision is, therefore, supported by substantial evidence and must be affirmed.

Plaintiff had also argued that the ALJ impermissibly "played doctor" when he noted that Plaintiff's activities of daily living were inconsistent wit Dr. Umali's opinions.  However, as discussed above, there were numerous reasons why the ALJ was justified in rejecting Dr. Umali's findings.  The ALJ did not replace the findings of a doctor with his own independent medical findings.  Instead, the ALJ rightly noted that Dr. Umali's findings were inconsistent with findings from other

doctors and reasonably pointed out that Plaintiff's activities of daily living did not match Dr. Umali's extreme and marked limitations.

Because the ALJ's decision denying controlling weight to Dr. Umali's opinions is supported by substantial evidence, the ALJ's RFC assessment is also supported by substantial evidence.  The ALJ reasonably determined that the opinions of Dr. Pressner and to an extent Dr. Fink somewhat understated Plaintiff's mental condition, and he also reasonably determined that the opinions of Dr. Umali overstated Plaintiff's mental condition.  He determined that Plaintiff was limited to only simple repetitive tasks (R.16), which was supported by the opinions of state agency psychologist Dr. Kladder (R. 268).  The ALJ also limited Plaintiff to no more than occasional contact with co-workers/supervisors and no contact with the public.  (R. 16).  This limitation was supported by the opinions of Dr. Kladder (R. 266-67), but it was also supported by Dr. Umali, who opined that Plaintiff was moderately limited in her ability to interact with the public, supervisors, and co-workers (R. 856).

## VII.  Conclusion

The ALJ's decision is supported by substantial evidence. The ALJ reasonably determined that Dr. Umali's opinions were not entitled to controlling weight, and he did not play doctor when he noted Plaintiff's activities of daily living.  The ALJ's RFC assessment is also supported by substantial evidence.

Therefore, the decision of the Commissioner of the Social Security Administration is **AFFIRMED.**

      **SO ORDERED** the 30th day of August, 2010.

_William G. Hussmann, Jr._
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Larry J. Schad
SCHAD & PALMER
lschad@schadlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov